Billy Ray Carter
2100 Napa Vallejo Hwy.
Napa, CA 94558
In pro se



IN THE UNITED STATES DISTRICT COURT

FOR THE NORTHERN DISTRICT OF CALIFORNIA

| BILLY RAY CARTER, | Case No. CV 08 2795 SBA (PR) |
|---|---|
| Plaintiff, | REQUEST FOR COURT TO ISSUE AND SERVE SUMMONS AND COMPLAINT, APPOINT COUNSEL, CERTIFY LAWSUIT AS A CLASS ACTION, AND EXEMPT LAWSUIT FROM ALL PRISON LITIGATION REFORM ACT PROVISIONS. |
| v. | |
| MR. ED FOULK, et al., | |
| Defendants. | |

**Introduction**

I filed this Civil Rights Lawsuit on June 4, 2008 to expose, redress, and rectify multiple perpetual violations of constitutional rights. I subsequently wrote a letter to the Court on June 9, 2008 explaining, inter alia, that I can arrange to have the $350.00 filing fee mailed to the Court in monthly payments of $25.00 each, and I may be able to send more money per month towards the fee on occasion and when I am able to do so I will.

**Service of Process**

Federal Rules of Civil Procedure, Rule 4(a), requires "the clerk shall forthwith issue the summons and deliver it to the marshal for service." The only Ninth Circuit case that I am currently aware of that explains Rule 4(a), is *Franklin v. State of Oregon*, 662 F.2d 1337, 1341 (9th Cir. 1981) ("The only circuit that has specifically addressed the meaning of this sentence in the context of sua sponte dismissals of complaints has held that Rule 4(a) requires 'the clerk to immediately issue a summons and deliver it to the marshal for service' without exception."),

citing *Nichols v. Schubert*, 499 F.2d 946, 947 (7th Cir. 1974); *Vina v. Hub Electric Co.*, 480 F.2d 1139, 1140 (7th Cir. 1973).

## Class Action Certification

This case meets all the prerequisites to a class action set forth in Federal Rules of Civil Procedure, Rule 23, and there are several other patients' (inmates') lawsuits filed against NSH that meet all the Rule 23 requirements to certify as a class action. (See C 03-3676 RMW (PR); C 03-2414 RMW RS (PR); C-07-0329-RMW; CV 07 6256 MHP (PR); CV 07 6307 MHP (PR); CV 08 2419 SI (PR); CV 08 2795 SBA (PR).) Notwithstanding, I cannot personally bring this action as a class action, or represent any other individuals other than myself, and the Courts have ruled that pro se plaintiffs are not adequate class representatives able to fairly represent and adequately protect the interests of the class. (*Oxendine v. Williams*, 509 F.2d 1405, 1407 (4th Cir. 1975); see also *Russell v. United States*, 308 F.2d 78, 79 (9th Cir. 1962) ("a litigant appearing in propria persona has no authority to represent anyone other than himself, so class certification may be denied on that basis. (*Griffin v. Smith*, 493 F. Supp. 129, 131 (W.D.N.Y. 1980) (denying class certification on basis that pro se prisoner cannot adequately represent class).

Therefore, this action cannot proceed as a class action unless the Court certifies this action as a class action and the other patients' lawsuits are joined.

## Appointment of Counsel

Persons committed to mental hospitals like plaintiff are entitled to receive "more considerate treatment and conditions of confinement than criminals whose conditions of confinement are designed to punish" (*Sharp vs. Weston*, 233 F. 3d 1166, 1172 (9th Cir. 2000), quoting *Youngberg v. Romeo* (1982) 457 U.S. 307 at 322, 102 S.Ct. 2452; Cf. *Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976), and mentally disordered persons—regardless of their path to the institution—should be regarded as patients rather than inmates in institutions. (*Department of Developmental Services v Ladd* (1990) 224 Cal.App. 3d 128, 137-138.) According to California Welfare and Institutions Code, § 6250, mentally disordered persons charged with crime or to the criminally insane subject to judicial commitment shall be treated, not as criminals, but as sick persons, and just as inmates confined in prisons have a constitutional right to meaningful access to the courts, persons involuntarily committed to State hospitals after criminal trials have a constitutional right to meaningful access to the courts. (*See Ward v. Kort*, 762 F.2d 856, 858 (10th Cir.1985); *Johnson by Johnson v. Brelje*, 701 F.2d 1201, 1207 (7th Cir.1983); *King v. Atiyeh* (9th Cir. 1987) 814 F.2d 565, 568 fn. 2.)

2

The constitutional and mental patients' rights look fine on paper, but despite "the 'civil' label-of-convenience" (*In re Gault* (1967) 387 U.S. 1, 50) the opposite is true in a variety of ways. The Prison Law Office at San Quentin comes to the aide of State prisoners' when their rights are violated or when they encounter any problems. The Prison Law Office is a privately supported group of attorneys supported in major part by a charitable foundation, and they provide direct legal services at no cost to prison inmates. The Prison Law Office has represented over 5,000 prisoners since the office was founded in 1976 and are still representing indigent inmates at no cost. (See *In re Head* (1986) 42 Cal.3d 223, 234.) On the other hand, Protection and Advocacy (PAI), Inc., a mammoth legal organization created by an Act of Congress (*Protection and Advocacy Mentally Ill Individuals Act of 1986* ("PAMII"), 42 U.S.C. §§ 10801-10851), rarely meaningfully advocate for the Napa State Hospital (NSH) patients no matter how much the patients are neglected, abused, and their constitutional rights are violated.

PAI is legally required to advocate for persons with developmental and psychiatric disabilities, and receives many "big money donations" from federal, state, and private sources, but PAI circumvents and fails in its duties. PAI bids and wins the California Department of Mental Health (DMH) Statewide Patients' Rights contract every year and some NSH patients believe the reason that PAI is virtually impotent and will not meaningfully advocate for the patients is because PAI receives huge donations from DMH, this is a conflict of interest, and PAI does not want to "bite the [DMH] hand that feeds them." There are several conflict of interest provisions in the PAI/DMH contract (Agreement number 04-74280-000) that PAI signed on February 3, 2005, and DMH signed on February 9, 2005. The contract provides for DMH to pay PAI taxpayer funds in the amount of $2,750,000.00 (Two Million Seven Hundred Fifty Dollars and No Cents) essentially in exchange for PAI providing a patients rights advocate and an assistant at three state mental institutions from January 1, 2005 through June 30, 2008.[1] All the outside human rights advocates and the patients that have seen the DMH/PAI contact are in agreement that the big money in exchange for scant advocacy services, and the fact that the Executive Directors of the State Hospitals are permitted to choose which advocates are employed at their respective hospitals per contract, contribute to the failure of PAI to meaningfully advocate for the NSH patients. (See enclosed copy of PAI Contract "Face Sheet," in MS Word

---

[1] A Public Records Act Request was made for the most recent PAI/DMH Contract months ago but the DMH Public Records Act Coordinator R. Ichiho did not produce all the records.

and "pdf" file formats (the MS Word unsigned copy was created or retyped for Clarity); page 2 of 16 of Contract Number: 04-74280-000; and page 4 of 16 of contract.)

NSH did not provide and even blocked access to sufficient legal research materials to prepare pro se pleadings, appeals, and other legal documents for the past several years. NSH subscribed to the West's Publishing Company West Mate computerized online legal research system for about one decade, but only permitted a few of the patients to infrequently use the system to do legal research. However, NSH cancelled the West Mate subscription and installed a virtually worthless legal research system owned by the "Touch Sonic Technologies, Inc.," not very long after the United States Department of Justice (USDOJ), Civil Rights Division, Special Litigation Section, abandoned the CRIPA lawsuit against NSH and obliged NSH officials to sign a consent judgment on May 2, 2006.

I was told that "timing can be considered as circumstantial evidence of retaliatory intent" (*Pratt v. Rowland* (1995) 65 F.3d 802, *quoting Soranno's Gasco, Inc. v. Morgan* (9th Cir. 1989) 874 F.2d 1310, 1316), and some patients suspect that it is not only a coincidence that NSH cancelled the West Mate subscription in retaliation right after the USDOJ dropped the lawsuit and when NSH felt it was safe to do so. (See also *Passantino v. Johnson & Johnson Consumer Products, Inc.* (9th Cir. 2000) 212 F.3d 493, 507.)

The NSH excuse for the cancellation is essentially that West Law cancelled the subscription because NSH violated the contract by permitting multiple users to use the system on a single user contract right after NSH settled the lawsuit with the USDOJ in May of 2006 and the timing is only coincidental. I know who the patients are that do their own legal work and I also know a lot of patients at NSH and I would know if NSH let multiple users use the West Mate system, and I cannot substantiate the NSH version of the cancellation, and I find it difficult to believe that West Law would cancel a subscription after 10 years of hardly anyone using the system only because a few different persons used the system under Psychiatric Social Worker Chris Herbert's password during a 10 year period. NSH upgraded the Touch Sonic Technologies, Inc., legal research system earlier this month (June 2008), but the system is still substandard, time consuming, not ergonomic, is not user friendly, and frequently malfunctions.

I do not have access to PACER, and because I am virtually indigent I cannot accomplish many other legal tasks and requirements. The state defendants, on the other hand, have access to state of the art high technology computer equipment and legal data bases, clerical supplies, greater access to prison administrative records, court documents, and a host of knowledgeable

attorneys who have represented the state prison officials in lawsuits brought by state prisoners. (See *Andrews v. United States*, 398 F.3d 1113, 1120 (9th Cir. 2005), citing *Wyatt v. Terhune*, 315 F.3d 1108, 1119 (9th Cir. 2003) The state defendants cannot in good faith dispute these facts.

The denials set forth above when taken individually or considered in the totality, are tantamount to the deprivation of the basic essentials of litigation and defense and are tantamount to actual injury and denial of meaningful access to the Courts. (See *Lewis v. Casey*, 518 U.S. 343, (1996); *Peterson v. United States*, 351 F.2d 606, 608 (9th Cir. 1965); *Little v. Turner*, 402 F.2d 495, 498 (10th Cir. 1968).) ("Our (their) decisions for more than a decade now have made clear that differences in access to the instruments needed to vindicate legal rights, when based upon the financial situation of the defendant, are repugnant to the Constitution.") (Several citations omitted.)

There are some very difficult and complex issues to litigate in this lawsuit and I need the assistance of counsel to argue these issues. A couple of the issues I would like to have counsel litigate is the seemingly "hands off" posture the courts have taken towards cases regarding mental patients, the decisions made by qualified professionals are not always valid, mental patients should not be subject to any provisions of the Prison Litigation Reform Act (PLRA), and mental patients should be held to less stringent pleading and other standards than prison inmates are held.

## THE PLRA

The discrepancy between the equitable treatment prisoners are given compared to the quasi "hands of doctrine" mental patients have been subjected to is shown by the courts applying the PLRA to mental patients' rights lawsuits even though "[i]t is beyond dispute that the primary purpose of the PLRA, and the exhaustion provisions in particular, was to reduce the inordinately large volume of '*prisoner cases*' being filed in the federal courts." (*Blas v. Endicott* (1999) 31 F.Supp.2d 1131, 1133) (Italics mine.) Anyone needs only to do a keyword search in any good legal database to ascertain that mental patients are getting a "bum rap" with the PLRA yoke tied around their necks in addition to having to overcome the Stigma of Mental Illness when trying to accomplish anything, and the number of cases filed in the federal courts by mental patients during the past 100 years is diminutive, and all the "diminutive" went nowhere fast.

The Court in *Gilmore v. California* stated the PLRA's sponsors decried "overzealous Federal courts ... micromanaging our Nation's prisons," and "judicial orders entered under Federal law that have effectively turned control of the prison system away from elected officials

accountable to the taxpayer, and over to the courts." (remarks of Sen. Abraham). The *Gilmore v. California* Court continued that "[f]rom these and other pronouncements, it is clear that Congress intended the PLRA to revive the hands-off doctrine. (See *Gilmore v. California*, 220 F.3d 987, 997 (9th Cir. 2000) (However, see *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007) (The Supreme Court emphasized that a document filed pro se should be construed even more liberally, "however inartfully pleaded.")

    I am a nobody being held unconstitutionally and virtually incommunicado in a mental institution and society does not count my opinion for much, but I disagree with the part above about "overzealous Federal courts ... micromanaging our Nation's prisons," and "judicial orders entered under Federal law that have effectively turned control of the prison system away from elected officials accountable to the taxpayer, and over to the courts," but I know how it feels to be sorely abused at every turn and have all your rights thrown out the window by persons that been corrupted by power. I also know how it feels to be ignored, neglected, and my credibility discredited by elected officials accountable to the taxpayer that are too busy to care and deceived by the persons committing the abuse. If the federal courts take a hands off doctrine and do not examine complaints of serious abuse in prisons and mental institutions, then who will? I do not know of any elected officials in history that went on a crusade for prisoner's rights or the rights of the mentally, and with all due respect I think that perhaps the PLRA's sponsors and Sen. Abraham spoke when they should have abstained.

    The PLRA defines "prisoner" as "any person incarcerated or detained in any facility who is accused of, convicted of, sentenced for, or adjudicated delinquent for, violations of criminal law or the terms and conditions of parole, probation, pretrial release, or diversionary program." (*LaFontant v. I.N.S.*, 135 F.3d 158, 165 (D.C. Cir. 1998) The Court hearing *Grondorf v. Grazaini*, C 03-4230 SI (PR) (2004), decided "Grondorf's confinement following a not-guilty-by-reason-of-insanity determination *appears* to make him a prisoner for purposes of 28 U.S.C. §§ 1915 and 1915A," and in support of that proposition the Court cited *In re Franklin*, 7 Cal.3d 126, 138, 143-144 (Cal.1972). (Class of persons committed to a state mental hospital following finding of not guilty by reason of insanity was different from class of persons subjected to ordinary civil commitment proceedings). (Italics mine.)

    Notwithstanding, the Court in *People v. Buttes* explained that a person who has been acquitted by reason of insanity is found not guilty of committing the crime and cannot be punished by incarceration in prison (Pen. Code, § 1026). The *People v. Buttes* Court continued

explaining that the California Supreme Court in *In re Franklin* 7 Cal.3d 126, 141-142 (1972), recognized this difference when quoting from *Bolton v. Harris* (D.C. Cir. 1968) 395 F.2d 642, 651. The Franklin court stated: "it is significant that the court in *Bolton* acknowledged governmental authority to treat persons acquitted by reason of insanity differently from civilly committed persons to the extent that there are relevant differences between these two groups ...."

It is noteworthy that the Grondorf Court stated it "'appears' to make him a prisoner for purposes of 28 U.S.C. §§ 1915 and 1915A," but a closer examination reveals that the *In re Franklin* Court was illustrating a completely different point and was not referring to any principles relating to the Prison Litigation Reform Act (PLRA), 18 U.S.C. § 3626, which was enacted on April 26, 1996, which is 24 years after *In re Franklin* was decided. The *In re Franklin* Court stated, "it is significant that the court in Bolton acknowledged governmental authority 'to treat persons acquitted by reason of insanity differently from civilly committed persons to the extent that there are relevant differences between these two groups.'" (*In re Franklin* (1972) 7 Cal.3d 126, at 142.) But it appears to me that the *In re Franklin* Court was discussing commitment standards and hearings and not referring to anything else.

It is difficult for a pro se litigant to square the United States Supreme Court in *Erickson v. Pardus* with the PLRA. That is, the PLRA seems to suggest or require the opposite of *Erickson v. Pardus* because the *Erickson v. Pardus* Court found a court of appeals had departed from the liberal pleading standards laid out in Federal Rule of Civil Procedure 8(a)(2). The Supreme Court emphasized that a document filed pro se should be construed even more liberally, "however inartfully pleaded ....." As a result, the Supreme Court reversed and remanded the case for further consideration. (See *Erickson v. Pardus*, 127 S.Ct. 2197, 2200 (2007).

**Conclusion**

NSH has been in existence for over one hundred years and I cannot find one instance where the conditions of confinement at NSH have been examined and rectified in all that time by a federal or state court, and I could not find one instance where a mental patient or anyone else has successfully sued NSH, and I do not believe this is because NSH is such a good and conscientious institution filled with beneficient and loving employees dedicated to their patients well being, and no institution or person is perfect or without sin. (John 8:7, KJV.)

The U.S. Department of Justice did sue NSH twice in last two decades for Napa's failure to provide adequate medical care, adequate nursing care, adequate nutritional services, and for putting its patients' lives in danger; but NSH quickly signed consent judgments each time to

circumvent the lawsuits and hired their own conflict of interest monitors to ensure "business continues as usual."

### Request

Therefore, I respectfully request the Court to issue and direct the U.S. Marshall to forthwith serve summons and complaint pursuant to Rule 4(a), to certify this lawsuit as a class action, to appoint counsel to represent my lawsuit and the other lawsuits against NHS, and to exempt lawsuits filed by mental patients from all the provisions of the PLRA, due to the above and following, but not limited to, reasons:

(1) The issues set forth in the complaint, above, and in the other lawsuits require investigation, discovery, expert testimony, and proof to be resolved and this is impossible to properly, adequately, and meaningfully accomplish without the assistance of counsel;

(2) This case involves complex legal issues that need to be examined and resolved. (*James S. Liebman & Randy Hertz*, Federal Habeas Corpus Practice and Procedure. (3 ed. 1998);

(3) I need counsel to conduct discovery;

(4) I cannot represent a class and this and the other cases filed against NSH fit all the Rule 23 prerequisites to a class action and this lawsuit and the others have an excellent chance of winning with a lawyer's representation. (See *Weygandt v. Look*, 718 F.2d 952, 954 (9th Cir. 1983 (per curim); see also *Winsett v. Washington*, 130 F.3d 269, 281 (7th Cir. 1997), quoting *Forbes v. Edgar*, 112 F.3d 262, 264 (7th Cir.1997)

(5) These cases raise issues of grave public concern and the United States Supreme Court has suggested the importance of determining important issues, which would not otherwise be decided. This is one of the types of cases where persons at low levels are perpetually deprived of constitutional rights and should not be left utterly remediless and defenseless against repetitions of unconstitutional conduct. (See *Sibron v. New York* (1968) 392 U.S. 40, 52-53 [20 L.Ed.2d 917, 928-929, 88 S.Ct. 1889].)

I declare under penalty of perjury that the foregoing is true and correct to the best of my knowledge, information, and belief.

Respectfully submitted,                                        Date:

Billy Ray Carter                                               7/1/08

*Billy Carter*

LEGAL-MAIL:

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
450 GOLDEN GATE AVE.
SAN FRANCISCO, CALIFORNIA, 94102

94102 3661 0004

